In re SUNNY BEACH MOTEL,
INC., Debtor.

Raymond B. RAY, Trustees, Plaintiff,

v.

Malkit Singh SAPPAL, Arth Edmund and
Rosalee; Arcese, Anthony and Evelyn;
Anderson, George B., et al, Defendants.

Bankruptcy No. 85–447–8P1.
Adv. No. 86–264.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 4, 1988.

A. Clifton Black, Orlando, Fla., for Creditors Committee.

Russell Bogue III, Tampa, Fla., for Second Equal Dignity Mortg. Holders.

Kenneth Crenshaw, Lake Worth, Fla., for Partial Creditors Committee, Oromocto Mortg.

Matt G. Firestone, Orlando, Fla., for Certain Oromocto Assignees.

Robert Paul Keeley, Hollywood, Fla., for Raymond Ray.

Lynn Jaems Hinson, Orlando, Fla., for John T. Smith.

Kenneth B. Crenshaw, Lake Worth, Fla., for Alan Reigle.

Thomas Ostrander, Palmetto, Fla., for Arthur Merchant.

Ernest Dean, Tampa, Fla., for Russell Bogue.

Peterson, Myers, Craig, Crews, Brandon, and Mann, Lake Wales, Fla., for Creditors Committee of Multi.

Chad Pugatch, Ft. Lauderdale, Fla., for Malkit Singh Sappal.

Gregory A. Presnell, Orlando, Fla., for Howard L. Gilbert.

Michael P. McMahon, Orlando, Fla., for Mr. & Mrs. Rulon Merrill.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

ALEXANDER L. PASKAY, Chief Judge.

This is a Chapter 11 case and the matter under consideration is the extent and priority of several mortgages which admittedly encumbered the one and only asset of Sunny Beach Motel, Inc. (Debtor), a property which had already been sold by the Trustee. The matter is presented for this Court's consideration by Raymond B. Ray, the Trustee for the estate of the Debtor who filed the above-captioned adversary proceeding. The Trustee seeks a resolution of the issues raised by the pleadings filed by three of the defendants named in the adversary proceeding, Malkit Singh Sappal (Sappal), a group collectively referred to as the "Oromocto Assignees" and a group collectively referred to as the "Second Equal Dignity Mortgage Holders" (EDM's). Oddly enough, the Trustee who is nominally the plaintiff in this adversary proceeding took no position concerning the respective priorities of the parties noted above, but merely seeks a determination from this Court how the proceeds derived from the sale of the property should be distributed. This is a total liquidation Chapter 11 case which involved a single asset of the Debtor fully encumbered with the mortgage liens of the Defendants, the validity of which is not disputed by anyone. For this reason, the general estate comprised of unsecured creditors have no interest in the matter and the controversy is really between competing claims of the Defendants to the funds currently held by the Trustee. Both the Trustee and the Defendants concede that there are no general issues of material facts and issues raised by their respective pleadings can be resolved as a matter of law by ruling on the Motions for Summary Judgment filed not only by the Trustee, but also by the Oromocto Assignees, Sappal and by the Creditors' Committee for the EDM's.

The undisputed facts as appear from the record are as follows: The Debtor is a Florida corporation formed in June 1982 by Sappal and several unidentified investors. The corporation was formed for the purpose of acquiring a motel facility known as Rodeway Inn, located in Fort Lauderdale, Florida from Eastern Alliance, Inc. (Eastern Alliance), an entity which held a 99-year lease on the land on which the motel facility was erected.

At the time the Debtor acquired the facility, the same was already encumbered by a first mortgage held by Depow Enterprises, Ltd. (Depow), securing an indebtedness evidenced by two promissory notes. These notes and the mortgage securing them were subsequently assigned by Depow to Oromocto Motor Inns, Ltd (Oromocto). On April 7, 1983, Sappal sold his stock interest in the Debtor corporation to an entity known as "Multi-National Management, Inc. (Multi-National). As part of this transaction, Sappal took back a mortgage on the motel facility. This mortgage expressly provided that it would be subject to certain Equal Dignity Mortgages which would be given to investors later on referred to as "EDM's." It is without question that at the time Multi-National acquired the controlling stock interest in the Debtor the EDM's had yet to invest any funds. However, beginning April 7, 1983, and continuing several months thereafter, the EDM's actually invested funds and received their respective mortgages encumbering the motel facility.

Prior to the change of stock ownership in the Debtor, the mortgage, and the promis-

sory notes which the mortgage secured, fell into default. In order to avoid litigation and foreclosure Sunny Beach and Oromocto entered into an agreement on April 21, 1983 and recorded same on June 24, 1983 (Exhibit 9–Depo K). The agreement provided that the interest on the notes shall be increased from the original contract rate of 9½% to 11%; it reduced the payment terms and in fact turned it into a balloon mortgage. In this connection it should be noted that the original Oromocto mortgage expressly provided for a default rate of interest of 15%. In the fall of 1983 the Oromocto mortgage again fell into default after the EDM's mortgages were already placed on the public records. It further appears that at that time there was already a foreclosure action pending, instituted by the holder of the first mortgage, which was ultimately satisfied. Oromocto, in order to protect its interest, filed a crossclaim against the Debtor and also sought to foreclose its mortgage. In December 1983 a crossclaim was settled by the execution of a document entitled "Stipulation for Settlement", dated December 19, 1983. Pursuant to this Stipulation which was to take effect January 10, 1984, an additional amount of $80,394.88 representing attorney fees due to Oromocto under its mortgage was added to the principal balance due under the Oromocto mortgage; the principal obligation was charged with an interest rate of 15%, a rate which was the original default rate provided by the mortgage held by Oromocto. It further appears that on January 10, the interest rate from the Oromocto mortgage was again modified and raised up to the rate of 18% per annum.

Beginning in 1984, Oromocto executed partial assignments of its mortgage to a group collectively referred to as "Oromocto Assignees." As a result of several transactions not relevant, Oromocto Assignees became the holders of the first mortgage encumbering the motel facility. It appears that Oromocto received only $724,000 for the assignment which is the principal amount secured by the mortgage lien of the Oromocto Assignees.

On February 25, 1985, the Debtor filed its voluntary petition for reorganization un-der Chapter 11 and Raymond B. Ray was appointed to serve as Trustee for the Debtor's estate. In due course the Trustee sold the 99–year lease with the proviso that all liens encumbering the property shall be transferred to the proceeds pursuant to an Order entered by this Court and be distributed after this Court determined the respective priorities and the extent of interest of the remaining competing interests of Oromocto Assignees, the EDM's and Sappal.

Based on the foregoing undisputed facts, Oromocto Assignees, the Trustee, Sappal and the Creditors' Committee representing EDM's all filed respective Motions for Summary Judgment. They all agree that the Oromocto Assignees are in first position to the net proceeds derived from the sale, but all groups violently disagree as to the amounts which should be paid to the Oromocto Assignees. This disagreement is based on a contention first that the amounts owed under the Oromocto mortgage should be limited to the principal and accrued unpaid interest only at the original contract rate of 9½% per annum; second, the Oromocto Assignees are not entitled to get paid at the modified interest rates of either 11%, 15%, or 18%. In addition, the EDM's and Sappal also contend that to tack $80,394.88 attorney fees to the Oromocto Mortgage also was an attempted modification of the mortgage which occurred after the EDM's interest became a matter of public record, therefore, the Oromocto Assignees are not entitled to the increased principal in any event, certainly not in an amount claimed, especially in light of the fact that the services rendered by the attorney in connection with the foreclosure action documents only 28.1 total hours.

Each moving party contends as does the Trustee that the controlling law supports their respective positions. The EDM's primarily rely on the case of *Bank of South Palm Beaches v. Stockton Whatley, Davin & Co.*, 473 So.2d 1358 (Fla. 4th DCA 1985) where it was held that monies due and owing based on a modification of a superior mortgage effected an already existing junior mortgage, therefore, was inferior to the

extent of the increase to the sums due and owing under the existing junior liens. The Court concluded that a priority of lien interest is governed by the time honored principle of "first in time is the first in right."

The difficulty with the proposition urged by the EDM's should be apparent when one considers the true nature of the modification involved in this case. There is no question that in the present instance there were no additional sums advanced by the first mortgagee, but the modification related solely to the enforcement of a vested contract right which provided in case of default that the original mortgage interest rate would change from the original contract of 9½% up to 15%. The fact that the first modification changed the interest rate only to 11%, and not to the default rate of 15%, is of no consequence. This is so because at the time the EDM's acquired their mortgage, the original mortgage was already a matter of public record which put on notice all subsequent lienholders that in the event there was a default in the first mortgage, the interest rate would be moved up to 15%. The same principle equally governs the change from 11% to 15%. However, the same principles do not apply to the additional modification from 15% to 18% since there was nothing in the original mortgage which permitted such change of the interest rate.

This leaves for consideration whether or not the attorney fees tacked on to the principal debt, which change admittedly occurred after the EDM's mortgages were already on record, should be permitted to stand as part of the principal obligation due and owing superior to the interest of the EDM's, and if so, to what extent.

There is hardly any question that the original mortgage which the Oromocto Assignees acquired provided for reasonable attorney fees and costs in the event the mortgagee was required to engage the services of an attorney to enforce the mortgage lien in the event of a default. This record is crystal clear that this is precisely what occurred and Oromocto was compelled to engage the services of an attor-ney who in fact filed a crossclaim against the Debtor in the pending foreclosure action. The fact that adjustment in principal by adding the attorney fees occurred after the EDM's mortgages were recorded is without significance and has only relevance as to what extent the attorney fees should be due and owing and recognized to be part of the indebtedness secured by the first mortgage. The services rendered by the attorney representing the Oromocto Assignees' interests is very poorly documented and only documented to the extent to establish a total of 28.1 hours spent by counsel. While it is conceivable and is argued that he in fact spent more time on this matter than what is shown by the documents, this does not support the proposition that the entire $80,394.88 shall stand. This Court is satisfied that the hourly rate charge was not unreasonable and for this reason the only increase in the principal obligation which permitted to stand shall be attorney fees in the amount of 28.1 × $125.00, or a total amount of $3,512.50.

Based on the foregoing, this Court is further satisfied that the Oromocto Assignees are the first mortgage holders and are entitled to an interest rate of 11% per annum on the total principal balance; that the mortgages held by the EDM's are in a second position; that the mortgage held by Sappal is in a third position; and that distribution of the sale proceeds should be in accordance.

Accordingly it is

ORDERED, ADJUDGED AND DE-CREED that the Motion for Summary Judgment filed by the Oromocto Assignees be, and the same is hereby granted in part and denied in part, and the Oromocto Assignees are determined to be in the first mortgage-holder position securing an indebtedness in the principal amount of $724,000 together with interest at the rate of eleven (11%) percent per annum on the principal balance which shall include $3,512.50 in attorneys fees commencing February 28, 1985, up to and including the entry of final judgment. It is further

ORDERED, ADJUDGED AND DE-CREED that the Motion for Summary

Judgment file by the EDM's be, and the same is hereby, granted to the extent that they are determined to hold a valid second mortgage on the subject property but denied to the extent that they may claim any interest superior to the Oromocto assignees. It is further

ORDERED, ADJUDGED AND DECREED that the Motion for Summary Judgment by Sappal be, and the same is, hereby denied and Sappal is determined to hold a third mortgage on the subject property. It is further

ORDERED, ADJUDGED AND DECREED that the Trustee's Motion for Summary Judgment be, and the same is hereby, granted and the priorities and interests of the Oromocto Assignees, the EDM's and Sappal are determined in accordance with the foregoing.